IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JOSEPH R. SEALS,

Plaintiff,

vs.

UNION PACIFIC RAILROAD CO.,

Defendant.

4:23CV3079

MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment. (Filing No. 99.)  For the reasons explained below, the motion will be granted.

**STATEMENT OF FACTS**

Plaintiff Joseph Seals began working for Defendant as a track laborer ("trackman") in September 2012.  (Filing No. 105-1.)  Plaintiff is African American. As a trackman, Plaintiff had to perform a range of physical tasks relating to the installation, inspection, maintenance and repair of railroad tracks. (Filing No. 103-3; Filing No. 105-1.)  The "essential functions" of the trackman position included the ability to clear brush and other obstructions from railroad tracks, drive spikes into railroad ties with a spike maul, pull spikes with a claw bar, install/remove rail anchors, set tie plates, load/unload/carry such heavy tools, walk on ballast and uneven ground, and operate and maintain powered hammers, wrenches, drills, tampers, and grinders. (Filing No. 103-3; Filing No. 105-1.) According to the trackman job description, it was also necessary for a trackman to "[t]ake appropriate action when conditions threaten safety of self or coworkers."  (Filing No. 103-3.)

In addition to trackman duties, Plaintiff also operated machinery, which required him to perform maintenance and repairs on the machines in the field.  (Filing No. 105-1; Filing No. 105-3.)  Plaintiff testified that if he failed to operate a machine correctly his co-workers "can die" and "you're going to kill them." (Filing No. 105-1.) Plaintiff agrees that if he suddenly lost

consciousness in his trackman role, he could have endangered himself and/or others. (Filing No. 105-1.) Plaintiff' position was considered "safety sensitive" by Defendant. (Filing No. 103-4.)

During the hiring process with Defendant, Plaintiff underwent a pre-employment medical evaluation with a company called LHI on August 3, 2012. (Filing No. 114-7.) LHI was a vendor Defendant used to perform physicals and similar types of medical examinations. (Filing No. 113-3.) During Plaintiff's pre-employment medical evaluation, the examiner noted that Plaintiff had high blood pressure; that he was on blood pressure medication; and that his hypertension was stable and treated. (Filing No. 114-7.) The medical examination also noted that Plaintiff had broken his ankle in 2002. (Filing No. 114-7.) The examiner found that Plaintiff's right ankle was "abnormal" and had limited dorsiflexion. (Filing No. 114-7.) Plaintiff walks with a limp and did so before he started working for Defendant. (Filing No. 105-1; Filing No. 113-6.)

When there were questions about whether an employee in a safety-critical role could safely perform the essential functions of his/her position, Defendant typically utilized a fitness for duty ("FFD") evaluation process conducted by its internal Health and Medical Services ("HMS") unit. (Filing No. 103-2.) There were various ways a FFD evaluation could be initiated, including through a manager referral. (Filing No. 103-2.) If employee medical records did not provide all the information HMS doctors needed to make a FFD determination, they would ask employees to have in-person examinations/evaluations by outside physicians to further inform the process. (Filing No. 105-6.) An employee might be asked to undergo an exercise tolerance test ("ETT")— a type of treadmill-based cardiovascular stress test—utilizing the Bruce Protocol. (Filing No. 105-6; Filing No. 105-8.) The results of ETT's are typically measured in "metabolic equivalents" ("METS"). (Filing No. 105-8.) Dr. Richard Lewis ("Dr. Lewis"), an Associate Medical Director in HMS, testified that it was Defendant's preference that individuals performing strenuous labor be able to achieve at least 10 METS. (Filing No. 105-8.)

On or about May 30, 2017, Plaintiff was referred for a FFD evaluation by his supervisor at the time, Kenneth Allen ("Allen"). (Filing No. 105-3.) On the FFD request form, Allen noted that Plaintiff "just need[s] to be evaluated" because he "has some ankle issue." (Filing No. 105-11.) Plaintiff's FFD was conducted by Dr. Lewis, who was typically assigned to handle manager referral cases. (Filing No. 105-8.) As part of the FFD evaluation process, Dr. Lewis requested

Plaintiff's recent medical records and directed Plaintiff to get an occupational medical evaluation from an area physician. (Filing No. 105-8.) That FFD evaluation process did not immediately move forward, however, because Plaintiff decided to have carpal tunnel surgery on both of his hands, as well as an ankle procedure that initially resulted in some medical restrictions from his treating doctor, Dr. Maria Buitrago ("Dr. Buitrago"). (Filing No. 105-8; Filing No. 105-12.) Those restrictions were not lifted until August 2018. (Filing No. 105-12.) After recovering from those treatments, Plaintiff was released by Dr. Buitrago to return to work without restrictions. (Filing No. 114-8.)

After Dr. Buitrago lifted the restrictions relating to his ankle procedure, the FFD evaluation process resumed. (Filing No. 105-8; Filing No. 105-12.) Dr. Lewis referred Plaintiff for an occupational medical examination by Dr. Rosalyn Beaty ("Dr. Beaty"). (Filing No. 105-8; Filing No. 105-12.) Dr. Lewis' referral letter to Dr. Beaty included reference to Plaintiff's cardiac status—noting the results of a stress test from October 2016 indicating hypertension, lack of ischemia, and 48% ejection fraction. (Filing No. 114-9.) Dr. Beaty had Plaintiff undergo a functional capacity evaluation ("FCE") and sent reports of the occupational medical examination and FCE to Defendant. (Filing No. 114-10; Filing No. 114-11.) Both reports indicated Plaintiff was able to perform the duties of his job. (Filing No. 114-10; Filing No. 114-11.) Dr. Lewis cleared Plaintiff to return to work without restrictions in October 2018. (Filing No. 105-12; Filing No. 113-3.) Because Plaintiff had been off work for over a year, he was then required to submit to another in-person medical examination by LHI. (Filing No. 113-3.) After LHI examined Plaintiff, another of Defendant's Associate Medical Directors, Dr. Matthew Hughes ("Dr. Hughes"), reviewed the report of that examination. (Filing No. 113-3; Filing No. 105-12.) Dr. Hughes cleared Plaintiff to return to work with no restrictions. (Filing No. 113-3; Filing No. 105-12.) Plaintiff went back to work on or around October 30, 2018. (Filing No. 105-2.)

On February 15, 2019, William Younger ("Younger")—Plaintiff's then supervisor—instituted a manager referral and referred Plaintiff for a FFD evaluation. (Filing No. 105-12.) In the form he filled out to request that Plaintiff undergo a FFD evaluation, Younger stated that Plaintiff was "unable to walk on flat surfaces without limping and staggering;" that he was "unable to walk on uneven surfaces;" that he was having "difficulty climbing" and "difficulty lifting;" and that he was "staggering," "stumbling," and had an "unsteady walk." (Filing No. 105-13.) Dr. Lewis

was assigned to supervise the FFD evaluation and was assisted by FFD nurse Brenda Kessler ("Kessler"). (Filing No. 105-8; Filing No. 105-12.) Because Younger requested the FFD evaluation, which was approved, Plaintiff was not permitted to return to work. (Filing No. 113-3.)

Dr. Lewis requested that Plaintiff receive an occupational medicine evaluation and another functional capacity evaluation from Dr. Beaty. (Filing No. 105-12.) HMS received the results of those evaluations on or around April 10, 2019. (Filing No. 105-12.) Upon review, Dr. Lewis elected to clear Plaintiff to return to work without restrictions but noted that Plaintiff might require a field functional evaluation ("FFE"). (Filing No. 105-8; Filing No. 105-12.) An FFE is conducted in the field, in real world work terrain and weather conditions. (Filing No. 105-6; Filing No. 105-8.) FFEs are often utilized when there is some sort of "mismatch" between observations of an employee's functionality in a clinical setting versus those in the field. (Filing No. 105-8.) When Younger learned Plaintiff had been released to work, Younger requested that Plaintiff undergo a FFE, and HMS approved this request. (Filing No. 105-12.) Due to this, Plaintiff was not permitted to return to work. (Filing No. 105-12; Filing No. 113-3.)

HMS required Plaintiff to undergo a Bruce Protocol ETT before he participated in the FFE. (Filing No. 105-6.) HMS advised Plaintiff of this requirement on or around April 23, 2019. (Filing No. 105-12.) Plaintiff took a Bruce Protocol ETT on April 29, 2019, which was administered at the office of external cardiologist, Dr. Baxter Montgomery ("Dr. Montgomery"). (Filing No. 105-16.) HMS received the results of the ETT sometime between May 3 and May 6, 2019. (Filing No. 105-12; Filing No. 114-2.) Plaintiff scored 11.7 METS on the ETT, and no additional cardiac concerns were reported at that time. (Filing No. 105-12.) Plaintiff was cleared to proceed with the FFE, which was scheduled for 6:00 a.m. on May 14, 2019. (Filing No. 105-12; Filing No. 105-17.)

The HMS nurse assigned to participate in the FFE was Marla Cole ("Cole"), who had prior experience in cardiac nursing. (Filing No. 105-18.) Two managers are required to perform an FFE. (Filing No. 105-12.) Gerald Noll ("Noll"), Justin Peavy ("Peavy"), and Younger participated in Defendant's FFE. (Filing No. 105-17; Filing No. 105-19; Filing No. 113-19.) Defendant's internal guidelines state that a manager who refers an employee for an FFE cannot conduct that employee's

4

FFE. (Filing No. 114-1.) However, in his deposition, Defendant's Chief Medical Officer, Dr. John Holland ("Dr. Holland"), testified that he does not believe there is an "absolute rule" against a requesting manager participating in an FFE, and instead characterized this as a "preference." (Filing No. 113-14.) When asked by Defendant's counsel why Younger was present at Plaintiff's FFE, Defendant's corporate designee, Kristi Deardorff, testified: "The only thing I can think is he wanted – he wanted to be there." (Filing No. 113-19.) An employee subject to an FFE has the option to have a union representative present as an "advocate" and to "observe" the evaluation. (Filing No. 113-19; Filing No. 114-1.) No union representative was present for Plaintiff's FFE, but there is no indication that Plaintiff requested one. (Filing No. 113-6.)

The FFE required Plaintiff to demonstrate satisfactory performance in a series of seven tasks related to functions of the Plaintiff's position. (Filing No. 105-19.) Plaintiff was able to complete the first two tasks, which included walking on a flat surface and carrying a track jack 50-yards. (Filing No. 105-19.) Cole, who took Plaintiff's vitals at least 10 times during the FFE, stopped the evaluation during the third task because she was concerned about Plaintiff's heart rate and blood pressure. (Filing No. 105-1; Filing No. 105-18; Filing No. 105-19.) The third task required performance of a series of track installation, maintenance and repair activities, which included pulling six spikes from railroad ties with a claw bar, plugging the spike holes with wood plugs, driving six spikes into ties with a spike maul, and removing and reinstalling rail anchors. (Filing No. 105-5; Filing No. 105-18; Filing No. 105-19.) Cole testified that she stopped the evaluation because she was afraid Plaintiff was at risk of losing consciousness due to a decrease in his blood pressure at the same time his heart rate was increasing. (Filing No. 105-18.)

On May 16, 2019, Plaintiff met with Dr. Montgomery to discuss changes to his blood pressure medication. (Filing No. 105-1; Filing No. 105-20.) Plaintiff was to undergo another FFE once his blood pressure medication issues were resolved. (Filing No. 105-12.) Dr. Montgomery advised Plaintiff to remain off work to make sure the issues with his blood pressure medication got straightened out. (Filing No. 105-1.) At the appointment, Dr. Montgomery assessed Plaintiff as having essential hypertension and silent myocardial ischemia. (Filing No. 105-20.) At a follow-up appointment on May 23, 2019, Dr. Montgomery reiterated those assessments and added chronic diastolic (congestive) heart failure. (Filing No. 105-20.)

On July 9, 2019, Plaintiff was cleared by his cardiologist, Dr. Matt Jacob ("Dr. Jacob"), "for full duty." (Filing No. 105-22.) That day, Plaintiff underwent a modified Bruce Protocol ETT. (Filing No. 105-22.) (Filing No. 105-9; Filing No. 105-12; Filing No. 105-22.) Plaintiff did not meet the 10 METS threshold during that ETT. (Filing No. 105-6; Filing No. 105-12.) According to Plaintiff's expert witness in this case, Dr. Kevin Trangle ("Dr. Trangle"), the July 2019 ETT result translated to a workload of 4-5 METS. (Filing No. 113-5.) However, that ETT did not measure Plaintiff's maximum exercise capacity. (Filing No. 113-11.)

After reviewing Plaintiff's medical records, including the results of the July 9, 2019 ETT, Dr. Holland issued "ongoing and not permanent" work restrictions which prevented Plaintiff from working as a trackman/machine operator. (Filing No. 105-24.) Dr. Holland's July 22, 2019 fitness-for-duty memorandum, which documented his decision to impose restrictions, referred to the manager referral form and notes from managers stating that Plaintiff had difficulty doing physical tasks and was unable to keep up with the crew. (Filing No. 105-24.) The memorandum also discussed the May 2019 FFE and stated that the FFE was stopped because Plaintiff's blood pressure and pulse were dropping, suggesting a possible health issue. (Filing No. 105-24.)

The memorandum also summarized Plaintiff's medical records received by HMS, which included a report of a clinic visit to Dr. Montgomery, reflecting that Plaintiff's medical history included: (1) essential hypertension, (2) silent myocardial infarction, (3) hypercholesterolemia, (4) chronic diastolic heart failure, and (5) chronic peripheral venous insufficiently. (Filing No. 105-24.) The memorandum also discussed the results of the July 2019 ETT. In the "Assessment" portion of the memorandum, Dr. Holland stated that Plaintiff's "medical records show that he does have some medical condition that may be contributing to his low exercise capacity, although much of his physical difficulty is probably due to a low level of physical conditioning." (Filing No. 105-24.) Dr. Holland further stated that "[g]iven [Plaintiff's] medical issues, and low level of conditioning, in my opinion it is very unlikely he will be able to achieve a measured exercise level of 10 METS." (Filing No. 105-24.)

Plaintiff spoke to Dr. Holland by telephone on August 2, 2019, and Dr. Holland explained that the restrictions could be re-evaluated if Plaintiff's conditioning improved such that he could

achieve 10 METS on an ETT and there were no other medical factors that indicated a significant safety risk. (Filing No. 105-1; Filing No. 105-6; Filing No. 105-12.)

On August 6, 2019, Dr. Montgomery prepared a letter stating that Plaintiff was being treated for (a) chronic diastolic (congestive) heart failure, (b) essential (primary) hypertension, and (c) silent myocardial ischemia, among other conditions. (Filing No. 105-26.) The letter stated an echocardiogram showed "normal LV systolic function with diastolic filling impairment, consistent with diastolic dysfunction" and that there was also "concentric LVH." (Filing No. 105-26.) The letter indicated the findings were consistent with "hypertensive heart disease," but that Plaintiff did not have congestive heart failure based on clinical findings. (Filing No. 105-26.)

On August 7, 2019, Plaintiff faxed his medical records from his treating cardiologists to Defendant, showing that he had scored 11.7 METS on a treadmill test in April 2019, and that the result of that test was "normal." (Filing No. 114-21.)

In August and September 2019, Dr. Holland sent Plaintiff's medical records to Dr. Brian Lowes ("Dr. Lowes"), a cardiologist at the University of Nebraska Medical Center, for review. (Filing No. 105-6; Filing No. 105-9; Filing No. 105-12.) Regarding the July 2019 ETT where Plaintiff achieved 4-5 METS, Dr. Lowes testified that the result was "not good" and he does not believe that level of aerobic conditioning is "okay to return to a safety-critical job that required heavy work." (Filing No. 105-9.)

Plaintiff took another ETT in September 2019, during which he achieved 13.4 METS, but also exhibited evidence of induced ischemia and post-test arrythmia. (Filing No. 105-27.) Dr. Lowes testified that a finding of cardiac ischemia with exercise would warrant "further evaluation and management" before the patient should do heavy work. (Filing No. 113-11.)

Upon Plaintiff's request for reconsideration, Dr. Holland made another fitness-for-duty determination in September 2019, concluding Plaintiff's medical restrictions should remain in place. (Filing No. 114-22.) Dr. Holland drafted another memorandum—dated September 9, 2019—to document his decision. (Filing No. 114-22.) The memorandum began by summarizing the status of the case review, and mentioned Plaintiff was referred for an FFD evaluation based on his manager's observations that he did not appear to have the physical ability to perform his work.

(Filing No. 114-22.) The memorandum noted that HMS received a medical record dated April 29, 2019, stating Plaintiff had achieved 10 METS on a Bruce Protocol exercise test, but that the test report and EKG tracings from the test were not provided. (Filing No. 114-22.) The memorandum discussed the FFE, noted that Plaintiff had an unsatisfactory performance, and that Plaintiff was only able to complete three of the seven tasks. (Filing No. 114-22.) The memorandum also discussed the July 2019 ETT where Plaintiff achieved an exercise level of 4-5 METS. (Filing No. 114-22.)

In the September 2019 memorandum, Dr. Holland stated he had sent Plaintiff's records to Dr. Lowes for review and that Dr. Lowes agreed with his assessment of Plaintiff's health and fitness. (Filing No. 114-22.) Dr. Holland noted that although Plaintiff had achieved 10 METS in the April 2019 ETT, this finding was inconsistent with the reports of his prior work performance, his low level of exercise ability only a few weeks later when he had the FFE, and his modified Bruce Protocol three months later on July 9, 2019. (Filing No. 114-22.) The memorandum stated that Plaintiff needed to achieve an exercise level of at least 10 METS on a standard Bruce Protocol treadmill test, with no evidence of cardiac ischemia or other abnormality, for Plaintiff to show adequate physical exercise ability to perform the trackman job. (Filing No. 114-22.)

On October 11, 2019, after receiving a report from Dr. Montgomery, Dr. Holland prepared another fitness-for-duty memorandum, which again set out work restrictions. (Filing No. 105-28.) The memorandum provided background information, and referenced Plaintiff's manager's observations, and Plaintiff's medical records and testing. (Filing No. 105-28.) It also discussed Dr. Montgomery's report and the results of Plaintiff's September 2019 ETT. Dr. Holland noted that while Plaintiff achieved an exercise level of 13.4 METS, the test was also positive for ischemia and that Plaintiff experienced post-exercise cardiac arrhythmia. (Filing No. 105-28.) The memorandum stated that Plaintiff's file had been sent to Dr. Lowes for review and that Dr. Lowes concluded that "this finding of cardiac ischemia with exercise" meant Plaintiff was at "unacceptable risk for sudden incapacitation." (Filing No. 105-28.) The memorandum stated that Plaintiff's case would be reopened if HMS received clinical records documenting improvement, and no cardiac ischemia with exercise. (Filing No. 105-28.)

Plaintiff was advised of the FFD outcome and that the restrictions prevented him from working as a trackman/machine operator. (Filing No. 105-29.) When Dr. Holland spoke with Plaintiff following the issuance of medical restrictions, he encouraged Plaintiff to work with Defendant's vocational rehabilitation department to find an alternative, less physically strenuous job within the company. (Filing No. 105-1.) Plaintiff does not recall ever calling Defendant for employment assistance counseling, and he did not pursue any other jobs with Defendant.  (Filing No. 105-1.)

Plaintiff began working outside of Defendant in late 2019. (Filing No. 113-6.) His first such role was in park maintenance for Parks & Recreation for about a year. (Filing No. 113-6.) Thereafter, he started driving a city bus for Metro. (Filing No. 113-6.) In October 2020, Plaintiff had a heart attack while driving a Metro bus. (Filing No. 113-6.) According to Dr. James O'Neil ("Dr. O'Neil"), who treated Plaintiff following his heart attack, Plaintiff had a type of heart attack called a "non-ST elevation myocardial infarction," or "non-STEMI." (Filing No. 113-4.) In general, non-STEMIs are less serious than "ST elevation myocardial infarctions," or "STEMIs." (Filing No. 113-4.) Plaintiff never lost consciousness during or after his non-STEMI. (Filing No. 113-4.) It is possible, but not common, for people to lose consciousness and even die from the type of heart attack that Plaintiff had. (Filing No. 113-4.) Plaintiff's heart attack was caused by a total blockage in one of his cardiac arteries. (Filing No. 113-4.) As treatment, he received a coronary stent. (Filing No. 113-4.) Dr. O'Neil's clinic released Plaintiff to return to work as a bus driver on October 24, 2020, just four days after his discharge from the hospital. (Filing No. 114-23.) Plaintiff has not had another heart attack or similar event since. (Filing No. 113-6.)

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).  If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

"On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party." *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* "The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmovant." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011) (quotation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson*, 643 F.3d at 1042 (quotation omitted).

## DISCUSSION

### 1.     Disability Discrimination

Plaintiff's Complaint asserts claims against Defendant based on alleged violations of 42 U.S.C. § 12112(a) and 42 U.S.C. § 12112(b)(6) of the Americans with Disabilities Act ("ADA"). (Filing No. 1.) Plaintiff notified the Court in his brief in opposition to Defendant's Motion for Summary Judgment that he no longer intends to pursue his § 12112(b)(6) claim and is voluntarily dismissing it. (Filing No. 111.) Therefore, the Court will dismiss Plaintiff's § 12112(b)(6) claim and will not address it further in this Memorandum and Order.

Section 12112(a) of the ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to" the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a claim under § 12112(a), the plaintiff must show "(1) he was 'disabled,' (2) he was 'qualified,' and (3) the employer imposed work limitations because of his disability." *Sanders v. Union Pac. R.R. Co*., 108 F.4th 1055, 1060 (8th Cir. 2024). As to the second prong, an employee is considered "qualified" if he can perform the essential functions of his job with or without reasonable accommodation. 42 U.S.C. § 12111(8). "An essential function 'means the fundamental job duties of the employment position the individual with a disability holds or desires.'" *Moritz v. Frontier Airlines, Inc*., 147 F.3d 784, 787 (8th Cir.1998) (quoting 29 C.F.R. § 1630.2(n)(1)). Here, Defendant does not argue Plaintiff was not "disabled" within the meaning of the ADA. Rather, Defendant challenges the sufficiency of the evidence on the second and third

elements—Defendant disputes that Plaintiff was "qualified" to perform the trackman/machinist position and asserts that Plaintiff was not discriminated against due to his disability.

To overcome summary judgment, Plaintiff must adduce "direct evidence" of disability discrimination or sufficient indirect evidence to support a reasonable "inference of unlawful discrimination." *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012). "In the absence of direct evidence of discrimination, [courts] apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to disability-discrimination claims." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016). Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *Anderson v. KAR Glob.*, 78 F.4th 1031, 1036 (8th Cir. 2023). If a prima facie case is established, a burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id*. at 1036-37. If the employer makes such a showing, the plaintiff must then demonstrate that the stated non-discriminatory rationale was a mere pretext for discrimination. *Id*.

The parties disagree on whether *McDonnell Douglas* provides the appropriate analysis for Plaintiff's claim. Defendant maintains that *McDonnell Douglas* applies, whereas Plaintiff argues it does not because, under his view, there is direct evidence of discrimination. However, the Court need not resolve this dispute. Defendant has raised the "direct threat" affirmative defense, arguing that Plaintiff was unable to safely perform the essential functions of his job, making him a "direct threat" to himself and/or others. The Court finds Defendant has established this defense and that summary judgment is therefore warranted.

The ADA permits employers to "include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." *See* 42 U.S.C. § 12113(a)–(b). The term "direct threat" has been defined to mean "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). In determining whether an individual poses a direct threat, factors to be considered include (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm. *Id*. To establish a direct-threat defense, the employer must "show that its

11

determination that [an employee] posed a direct threat was: (1) the result of an individualized assessment, (2) objectively reasonable, and (3) based on the 'most current medical knowledge and/or on the best available objective evidence.'" *Sanders*, 108 F.4th at 1060 (quoting 29 C.F.R. § 1630.2(r)). Defendant bears the burden of proving this affirmative defense.  *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007).

There is no dispute that Plaintiff occupied a safety sensitive position and that if Plaintiff failed to perform his job properly, serious harm could result. Plaintiff admitted during his deposition that if he did not operate a machine correctly his co-workers could die.  Also, Plaintiff offers little resistance to the conclusion that Defendant conducted a personalized, "individualized assessment" of his ability to safely perform the essential functions of his job. Dr. Holland relied on evaluations by medical professionals and information contained in Plaintiff's medical records to reach his decision. *See Bingham v. Union Pac. R.R. Co.*, 693 F. Supp.3d 1033 (D. Neb. 2023) (finding an individualized assessment was performed where the defendant requested the plaintiff's medical records and had an experienced doctor review the records and conduct a FFD evaluation to determine whether the plaintiff could return to work). No reasonable jury could conclude that an individualized assessment specific to Plaintiff's circumstances was not performed.

Plaintiff's primary argument is that fact issues preclude summary judgment on the direct threat defense because Defendant's fitness-for-duty evaluations were not objectively reasonable, and that Defendant ignored the most current medical knowledge and best available objective evidence in reaching the FFD decision.  The Court finds these arguments unpersuasive.

Plaintiff maintains the evidence shows Dr. Holland acted unreasonably because at least seven other doctors cleared him to return to work. It is true that in the timeline of events, several doctors cleared Plaintiff to return to work. However, many of these doctors were assessing Defendant's ankle/mobility issues, which was not the reason restrictions were imposed. Although Plaintiff's cardiologists—Dr. Montgomery and Dr. Jacob—approved Plaintiff to return to work, there is no evidence that these doctors had more than a "basic understanding of what duties [the trackman] job entailed and what its physical demands were." (Filing No. 115.) *See Jackson v. Union Pac. R.R. Co.*, No. 4:19CV69, 2021 WL 1726895, at *20 (S.D. Iowa Mar. 29, 2021) (finding

the defendant had satisfied its burden to show direct threat, while noting that there was no indication that the plaintiff's physicians understood his specific job duties).

Although Dr. Holland's opinion may have differed from those of Dr. Montgomery and Dr. Jacob, this does not mean Dr. Holland's assessment was objectively unreasonable. Plaintiff himself acknowledges that the direct threat defense does not require complete agreement among all doctors. (Filing No. 111.) To be sure, reasonable doctors can disagree "as to whether a particular employee can safely perform the functions of his job." *Michael v. City of Troy Police Department*, 808 F.3d 304, 309 (6th Cir. 2015). "Indeed, in many cases, the question whether one doctor is right that an employee can safely perform his job functions, or another doctor is right that the employee cannot, will be unknowable—unless the employer runs the very risk that the law seeks to prevent." *Id. See also Jackson*, 2021 WL 1726895, at *20 ("In a direct threat analysis, the factfinder does not resolve disagreements between experts, as long as the evidence, viewed in the light most favorable to the nonmoving party, shows the individualized assessment was objectively reasonable.").

Dr. Holland's opinion—though perhaps different than that of Dr. Montgomery and Dr. Jacob—was amply supported by medical documentation and testing. To begin with, Plaintiff's FFE was terminated due to concerns with his heart rate and blood pressure. After that, Plaintiff took an ETT where he did not meet the 10 METS threshold. Then, in September 2019, Plaintiff was able to reach the METS requirement but nonetheless exhibited evidence of induced ischemia and post-test arrythmia. Dr. Holland asked Dr. Lowes to review Plaintiff's file, and Dr. Lowes agreed that Plaintiff was an unacceptable risk for sudden incapacitation. As proven later, Dr. Holland was rightly concerned with Plaintiff's cardiac health. Plaintiff subsequently had a heart attack while driving a city bus, though he thankfully did not experience a loss of consciousness or injure himself or others. The evidence, viewed in the light most favorable to Plaintiff, shows Dr. Holland's assessment was objectively reasonable.

Plaintiff seems to suggest that Dr. Holland should not have considered (or given significant weight to) the above-mentioned medical and evaluation history and instead focused on the results of the April 2019 ETT. Plaintiff argues Dr. Holland ignored that test result and inappropriately favored the observations of managers and the July 2019 ETT which did not measure his maximum

exercise capacity.  However, the record demonstrates that Dr. Holland did not disregard the April ETT result.  In his September 2019 memorandum—where he documented his reconsideration of Plaintiff's work restrictions—Dr. Holland referred to the April 2019 test.  He noted he had not received the printed test report or the EKG tracings. He also stated that the METS score from that test was inconsistent with the subsequent FFE and the more-recent July 2019 ETT, where Plaintiff scored 4-5 METS.  Just because Dr. Holland did not blindly accept the April 2019 METS score and use it as the absolute basis for his conclusion, does not mean he ignored medical evidence. Rather, Dr. Holland was doing what is legally required—relying upon the most current medical knowledge.

The same is true with respect to scientific information that Dr. Holland supposedly received in 2015. Plaintiff complains that Dr. Holland wrongly disregarded information he gained in 2015, after consulting with a professor of exercise physiology and cardiovascular health about a case involving another employee. According to Plaintiff, that professor informed Dr. Holland that the consensus among clinicians was that it was safe for individuals with coronary heart disease to exercise and work at high cardiovascular intensities. With all due respect to Plaintiff, this argument is nonsensical. Dr. Holland did not act unreasonably by choosing not to rely on information he had received years prior in relation to another employee.  This is hardly the type of individualized assessment contemplated by the law.  The 2015 information was not specifically tied to Plaintiff or Plaintiff's circumstances and was certainly not the most current and/or best available evidence.

Plaintiff further argues Dr. Holland ignored Defendant's own medical standards to reach a predetermined decision. Defendant's medical standards provide that an employee who can achieve 10 METS on an exercise tolerance test, without evidence of ischemia, will generally not be given work restrictions. (Filing No. 113-2.) While Plaintiff had scored 10 METS on an exercise tolerance test as of the date Dr. Holland prepared the first FFD memorandum, there was other evidence of concern at the time restrictions were imposed, including the unsatisfactory FFE. Plaintiff suggests that Dr. Holland should have disregarded this information and just relied on the fact that he had achieved 10 METS in April 2019—which was *before* the FFE and during the period when Plaintiff's evaluation was primarily focused on mobility issues.  However, if Defendant had just stopped its investigation based on the April test result, though it was aware of information reflecting negatively upon Plaintiff's health, it almost certainly would have been accused of

14

negligence had Plaintiff become incapacitated and caused a workplace accident. *See Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 341 (4th Cir. 2022) (noting that if a "failure to investigate [were] to cause a train wreck, [the defendant] would be told under the unremitting glare of hindsight of all it should have done"). This is not what the ADA requires.

In a last-ditch effort to save his case, Plaintiff argues that Dr. Holland's rationale for his work restrictions shifted over time, which provides a basis to conclude that Dr. Holland's evaluation was not objectively reasonable. Plaintiff points to differences in the content of Dr. Holland's three FFD memorandums. In his first FFD decision, Dr. Holland based his restrictions on low exercise capacity. Dr. Holland documented his reconsideration of the restrictions in his second memorandum, in which he stated that Plaintiff had demonstrated a low level of exercise capacity. In the third memorandum, Dr. Holland stated the basis for his restrictions was sudden risk of incapacitation based on the finding of exercise-induced ischemia, rather than low exercise capacity. Although the stated basis for the restrictions changed over time, the three memorandums are not as inconsistent as Plaintiff would like the Court to believe. The memorandums all documented the same course of events, but evolved as more information became available. From the very beginning of the FFD process, Dr. Holland discussed Plaintiff's medical history and expressed his suspicion that Plaintiff's medical issues were contributing to this low exercise capacity. The progression and refinement of Dr. Holland's assessment does not provide a basis to conclude that Dr. Holland's opinion was not objectively reasonable.

Based on this record in this case, the Court finds there are no grounds upon which a rational juror could conclude that Defendant's determination that Plaintiff posed a direct threat was objectively unreasonable or not based upon the best available objective evidence. Because Defendant has met its burden of establishing the affirmative defense of direct threat, Plaintiff's disability discrimination claim will be dismissed.

## 2. Race Discrimination

Plaintiff has also brought a claim for race discrimination under 42 U.S.C. § 1981. Plaintiff is proceeding under a "cat's paw" theory, as described by the United States Supreme Court in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). To succeed under a "cat's paw" theory, there must be a showing that a supervisor without ultimate decision-making authority (1) performed an

act with discriminatory intent (2) to cause an adverse employment action to be taken against the plaintiff and (3) the act was a proximate cause of the ultimate adverse action. *Id.* at 422. The plaintiff must "adduce sufficient evidence that the immediate supervisor initiated, exercised, or . . . possessed" "influence or leverage over the ultimate decisionmaker." *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 820 (8th Cir. 2017) (quotation omitted). Plaintiff alleges Younger concocted a plan to "get rid of" Plaintiff by referring him for a FFD evaluation and FFE. Plaintiff claims Younger lacked the power to eliminate Plaintiff on his own, so he referred Plaintiff for evaluations and influenced the process so the ultimate decision maker—Dr. Holland—could help him achieve his goal.

Plaintiff alleges Younger displayed racial bias, which supports the conclusion that Younger acted with discriminatory intent. Plaintiff claims Younger favored white employees with better tools, equipment, work assignments, performance reviews, and leave, and that Younger directed intimidating mannerisms towards employees of color, including himself. (Filing No. 113-6.) In support, Plaintiff cites alleged complaints of discrimination made against Younger by other employees between 2017 and 2021. (Filing No. 114-25.) Several of the allegations in those complaints, which are summarized in documents Defendant produced during discovery, are like those advanced by Plaintiff here, including assertions that Younger favored white employees with better tools, equipment, and work assignments. (Filing No. 114-25.) There were also reported allegations that Younger displayed mannerisms that made employees of color think he disliked them, and that Younger was overheard on occasion stating that he only wanted to work with white people. (Filing No. 114-25.)

Other employee complaints against Younger that Defendant documented included assertions that he told Hispanic employees that they could not speak Spanish and got upset when they did so; blamed an African-American employee for something that was a white employee's fault; and singled out an African-American employee for smoking when many other people were smoking. (Filing No. 114-25.) Additionally, there was a report that Younger made a comment regarding "this big black guy," "Obama stores," and "Obama people." (Filing No. 114-26; Filing No. 114-27.) There was a sentiment expressed that Younger was looking for excuses to get employees of color terminated. (Filing No. 114-25.) During his deposition in this case, Younger

acknowledged that he did not have the authority to "get rid of" Hispanic and African American employees. (Filing No. 113-7.)

Plaintiff argues a genuine dispute of fact regarding discriminatory intent and causation also exists because Younger requested a FFD evaluation just over three months after Plaintiff had been examined and deemed acceptable to return to duty by physicians. Plaintiff claims Younger exaggerated his limp, ability to walk, climb, and lift. Then, after Plaintiff was again cleared to return to work, Younger—undeterred—requested an FFE. According to Plaintiff, Younger proceeded to involve himself in the evaluation process by participating in the FFE, contrary to Plaintiff's guidelines for FFE evaluations. Plaintiff contends Younger even tried to make Younger's FFE harder by proposing that it occur at 1:00 a.m.[1] (Filing No. 113-8.) Plaintiff maintains Younger's referral for a FFD evaluation and FFE based on exaggerated (or false) observations was the proximate cause of Dr. Holland's decision to impose medical restrictions, and that Younger's influence over the process is documented in Dr. Holland's fitness-for-duty memorandums, which reference Younger's observations.

There are several problems with Plaintiff's arguments, however. The first issue deals with Plaintiff's lack of specificity and reliance on sheer speculation. Plaintiff largely speaks in generalities. He has not identified any specific, similarly situated white employees who were treated more favorably than him. (Filing No. 103-6; Filing No. 120.) Plaintiff points to Defendant's internal records documenting supposed employee complaints made against Younger between 2017 and 2021.[2] But the only incident in which there was an internal finding of a substantiated charge

---

[1] This time suggestion was not approved. (Filing No. 113-1.)

[2] In its reply to Plaintiff's statement of undisputed facts, Defendant objects to the evidence documenting the employee complaints against Younger, arguing that it constitutes inadmissible hearsay under Federal Rules of Evidence 801 and 802 and thus cannot be considered by the Court in connection with the summary judgment motion. *See Davis v. City of Little Rock*, 122 F.4th 326, 331 (8th Cir. 2024) ("When ruling on a summary judgment motion, the district court may consider only the portion of the submitted materials that is admissible or useable at trial."). However, "the standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in an admissible form." *Gannon Intern, Ltd v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012). The Court agrees that complaints from unidentified third parties could be inadmissible hearsay, depending on why it would be offered at trial. However, there has not been an attempt to explain how this evidence could/could not be offered in an admissible form at trial. In any event, even if the Court were to consider this evidence, it does not raise a genuine dispute of fact sufficient to preclude summary judgment.

against Younger occurred in 2021—well-after Plaintiff had left Defendant's employment—when he was accused of making insensitive comments.[3] (Filing No. 105-5; Filing No. 120.)

Also, Younger was not the only supervisor who referred Plaintiff for a FFD evaluation. In 2017, Plaintiff was referred for a FFD evaluation due to an ankle issue which, much like Younger's referral, tends to speak to mobility issues. Plaintiff contends the vague detail in the first manager's referral, compared to the level of detail in Younger's referral, shows that Younger embellished his observations. However, this is pure speculation. The difference in detail between the two referrals could just as easily be explained by differences in management style and/or deterioration in Plaintiff's condition. In short, Plaintiff has not presented evidence upon which a rational juror could find that Younger referred him for a FFD evaluation or FFE due to his race.

The most significant flaw in Plaintiff's cat's paw claim is that he has no evidence that Younger influenced Dr. Holland's decision to impose medical restrictions, nor any evidence that Dr. Holland himself racially discriminated against him. Plaintiff makes much of the fact that Dr. Holland's fitness-for-duty memorandums mention Younger's observations. But it is apparent from reading these documents that the references to manager observations of Plaintiff's work performance were oftentimes made for background purposes and, in any event, were not the ultimate reason that Dr. Holland imposed medical restrictions. Medical evidence reflecting negatively upon Plaintiff's exercise capacity and cardiac health supplied the basis for Dr. Holland's decision. Younger did not filter the medical information and opinions given to Dr. Holland by other medical professionals or attempt to influence Dr. Holland or Dr. Lowes' medical opinions. Younger was not involved in Plaintiff's medical testing and did not take part in interpreting test results or formulating medical restrictions. It does not appear that Dr. Holland even spoke to Younger. There is no evidence that Younger exercised any influence or leverage whatsoever over the decision to impose medical restrictions.

---

[3] To the extent, if any, that Plaintiff claims Younger's purported discriminatory behavior was in retaliation for a race discrimination complaint Plaintiff made with the U.S. Equal Employment Opportunity Commission ("EEOC") in May 2013, the claim is rejected. (Filing No. 105-30.) There is no evidence that Younger was even aware Plaintiff had filed the 2013 EEOC charge, and the charge did not pertain to Younger. (Filing No. 105-4; Filing No. 120.) Also, there is no temporal proximity between Plaintiff's 2013 EEOC complaint and the imposition of medical restrictions on him six years later. See *Onyiah v. St. Cloud State University*, 5 F.4th 926, 930 (8th Cir. 2021) (finding no causation where there were three and five-year gaps between the "protected activity" and the alleged adverse employment actions).

Also, the relationship between the FFD and FFE referrals and Dr. Holland's medical restrictions is tenuous, at best. Younger referred Plaintiff for a FFD evaluation and FFE based on purported observations that Plaintiff was unable to walk on flat or uneven surfaces, was staggering and stumbling, and had difficulty climbing and lifting. However, the medical restrictions ultimately imposed were not related to these types of concerns. The medical restrictions imposed stemmed from cardiac health concerns that were brought to light through the FFD and FFE process. The fact that Younger initiated the FFD evaluation and FFE does not mean that Dr. Holland was a dupe in Younger's alleged scheme to "get rid of" Plaintiff. Dr. Holland did not just rubber stamp Younger's observations and use them to impose medical restrictions. Dr. Holland performed an independent examination which included sending Plaintiff's medical records to another physician for review. Although Younger arguably should not have participated in the FFE evaluation process, his presence at the FFE had no impact on the FFE—he did not make the decision to stop the evaluation, nor did Dr. Holland. That decision was made by another medical professional when Plaintiff's vitals raised concerns. There is no evidence this medical professional displayed any racial bias. In short, the relationship between the medical restrictions imposed by Dr. Holland for cardiac concerns revealed during the FFD and FFE process and Younger's referrals is simply too remote, contingent, and indirect for a finding of proximate cause.

Because a reasonable jury could not find in Plaintiff's favor on his race discrimination claim, it will be dismissed.

Accordingly,

**IT IS ORDERED:**

    1.    Defendant's Motion for Summary Judgment (Filing No. 99) is granted.

    2.    Judgment will be entered by separate document.

Dated this 23rd day of July, 2025.

BY THE COURT:

Susan M. Bazis

Susan M. Bazis
United States District Judge

19